AZTEC CORPORATION, Appellant,

v.

TUBULAR STEEL, INC., Appellee.

No. B14–87–00131–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 11, 1988.

794

Paxton Lowery, Houston, for appellant.
Thomas A. Croft, Houston, for appellee.

Before MURPHY, DRAUGHN and ELLIS, JJ.

## OPINION

MURPHY, Justice.

The dispute underlying this appeal concerned a sale of goods. Tubular Steel, Inc. ("Tubular"), appellee, sued Aztec Corporation ("Aztec"), appellant, for breach of contract, breach of express warranty, fraudulent misrepresentation, attorneys' fees, and interest. Trial resulted in jury findings favorable to the plaintiff and judgment in the amount of $35,000 in actual damages plus pre-judgment interest and attorneys' fees. Both parties appeal. Aztec contests the finding of liability and rendition of judgment while Tubular attacks the amount of damages awarded. We affirm

the finding of liability and render judgment that Tubular recover the sum of $64,739, pre-judgment interest, calculated at six percent per annum beginning thirty days after the creation of the debt on November 16, 1981, and those attorneys' fees awarded by the trial court.

Tubular is a Missouri corporation specializing in the wholesale distribution of steel tubular goods, including pipe used in oil field operations. In November 1981 Tubular received an order from its customer, Peabody World Trade, to supply 22,060 feet of 7–inch outside diameter, 29–pound pipe with long thread and couple. The pipe was to be accompanied by mill papers, certifying the physical and chemical composition of the pipe. The end finish on the pipe was critical in order that its segments could be screwed together for use in the oil field.

In attempting to fill the Peabody order according to its specifications, Tubular salesmen called several sources, including Aztec, a Louisiana corporation specializing in the purchase and sale of pipe. Mr. Ken Chalaire, Aztec's operations manager, quoted Tubular a price of $29.23 per foot to supply the pipe to which Tubular orally agreed. A written purchase order was then mailed to Aztec, reciting the quantity, price and specifications and other requisites, such as mill papers and thread protectors. Subsequently, Mr. Chalaire told Tubular's sales representative, Michael Hefferon, that Aztec would not be able to fill the order from its own inventory after all, but that a personal friend of his, Jim LaBouve, had the pipe and could supply it. Time was critical to Tubular's customer, Peabody, because the pipe was to be shipped out of the country from the port of Houston on a given date. In order to meet the deadline imposed by Peabody, Aztec instructed Tubular to wire payment directly to the account of LaBouve Drilling at a Houston bank. The funds were transferred, but the pipe that arrived at the port of Houston did not meet the specifications of the purchase order and was rejected by Peabody. Fortunately, Tubular was able to find pipe that conformed to Peabody's specifications for $29.79 per foot, or $67,-325. When Tubular was unable to obtain a refund from Aztec or LaBouve of $64,739 paid for the nonconforming goods, it sued for its cost of cover and incidental expenses incurred in disposing of the pipe.

In response to special issues, the jury found that Ken Chalaire was acting as the agent for Aztec Corporation, that Aztec did enter into a contract with Tubular to supply pipe, that Aztec warranted that the pipe would have long thread and couple and would have accompanying mill papers, that Aztec failed to deliver pipe conforming to its contract or warranties, that such failure was a proximate cause of damage to Tubular, that Aztec made false representations to Tubular that it had located pipe conforming to the contract specifications, that Tubular relied on the false representations to its detriment, and that $35,000 would compensate Tubular for its damage.

In its first, second, sixth, and seventh points of error, appellant attacks the legal and factual sufficiency of the evidence to support the jury's findings of agency, the existence of a contract, false representation, detrimental reliance, and damages.

■ In addressing "no evidence" points, we consider only the evidence to support the finding, and we disregard all evidence and inferences to the contrary. *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If there is any evidence of probative force to support the finding of the trial court, the point must be overruled. In reviewing a contention that there is insufficient evidence to support the jury's finding, the appellate court will review the entire record and uphold the finding unless the evidence is so weak as to be manifestly erroneous or unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Special Issue No. 1 inquired:

Do you find from a preponderance of the evidence that Ken Chalaire was acting as the agent for Aztec Corp. in his dealings with Tubular Steel, Inc., on the occasion in question?

There followed a lengthy instruction describing the various ways in which agency could be created, including creation by ap-

parent authority. The instruction concluded:

A party dealing with an agent must ascertain both the fact and scope of the agent's authority, and, if the party deals with the agent without having done so, he deals with the agent at his own risk. When a buyer deals with an agent who is a salesman, this requirement of ascertaining the salesman's authority is particularly strict.

Answer "Yes" or "No."

The unanimous response of the jury was "Yes."

Appellant makes no complaint on appeal as to the form of this issue, only to the sufficiency of the evidence to support the jury's finding. The existence of agency is a question of law based upon facts regarding the actions of the parties. *Bradstreet Co. v. Gill*, 72 Tex. 115, 9 S.W. 753, 754 (1888); *Somerville v. Smith*, 200 S.W.2d 242, 243 (Tex.Civ.App.—Fort Worth 1947, no writ). Although the issue posed to the jury was a question for the trial court, the trial court made its determination that agency existed as a matter of law when it rendered judgment on the verdict.

A finding of agency is insufficient without a further actual or implied finding that the acts resulting in injury were performed within the scope of authority of the alleged agent. *Pasadena Associates v. Conner*, 460 S.W.2d 473, 479 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.). In this case, Tubular has obtained implied findings on the fact issues regarding the actions of the parties. Because there was no specific finding by the jury on the question of scope of agency, we necessarily imply an affirmative finding by the court on that issue in as much as it rendered a judgment favorable to the plaintiff. *Ibid.* at 479; TEX.R.CIV.P. 279.

The general rule of principal-agent relations is that the agent's unauthorized actions do not bind the principal unless (1) the principal ratifies those actions or (2) the principal is estopped from denying the authority of those actions. *Longoria v. Atlantic Gulf Enterprises, Inc.*, 572 S.W.2d 71, 72 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). The doctrine of apparent authority arises from the second prong of this rule. Apparent authority is determined by examining only the acts of the principal; representations of the alleged agent are of no effect. *Southwest Title Insurance Co. v. Northland Building Corp.*, 552 S.W.2d 425, 438 (Tex.1977); *Guthrie v. Republic National Ins. Co.*, 682 S.W.2d 634, 637 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

There was substantial evidence to support a finding that Ken Chalaire was the apparent agent of Aztec. Aztec's president employed Mr. Chalaire, gave him the title of "operations manager," and established him in a private office with a telephone on which to conduct company business. Aztec was in the business of buying and selling tubular steel. Tubular testified that its initial contact with Mr. Chalaire was established by calling Aztec's main switchboard and asking for a salesman. Tubular's corporate records indicate that forty-four calls were made to Aztec in the month the goods were sold, each was placed through the Aztec switchboard, and at no time was a Tubular employee told that, in dealing with Mr. Chalaire, they were not contracting with a salesman. After the price was determined, the evidence showed that a purchase order was mailed to Aztec by Tubular. The jury could reasonably assume that the purchase order was delivered to Aztec, yet Aztec made no effort to inform Tubular that in reaching the verbal agreement, Mr. Chalaire had exceeded his authority. The only evidence tending to refute the existence of agency was the testimony of Mr. Chalaire and Mr. Paul Porche, Aztec's president. Mr. Chalaire stated that he would not quote the price of pipe to someone who was not an end user, but that he would use his resources to locate pipe. He further said, "Actually, my job worked out to be playing racketball with Paul Porche down here at seven o'clock in the morning maybe three days a week. There was not a lot you could sink your teeth into." Mr. Porche testified that Mr. Chalaire was only authorized to find sources of pipe; he was not authorized to agree to sell a customer a third party's pipe. Mr.

Porche's testimony was contradicted by Mr. LaBouve who quoted Mr. Porche as explaining that Mr. Chalaire had been fired by Aztec for failing to make enough sales. Mr. Porche also admitted that had Mr. Chalaire located any prospective purchases they would not have been reported to Mr. Porche but to Ron Burley, division manager, who knew more about what Mr. Chalaire was doing. Mr. Burley was not called to testify. Mr. Porche further acknowledged that Aztec had no group or sales meetings. Because they were a small office, they saw each other daily and operated in an informal manner.

From our review of the evidence, we conclude that by its actions in giving Mr. Chalaire the indicia of a salesman and by its failure to monitor Mr. Chalaire's actual dealings from his offices at Aztec, appellant represented Ken Chalaire as possessing the apparent authority to make a contract for sale of tubular goods on behalf of Aztec. The evidence showed that, within the industry, searches and sales were routinely conducted over the telephone. Although Tubular was openly dealing with Aztec through Mr. Chalaire, no effort was made by Aztec to communicate to its potential customer the secret limitations placed upon the scope of Mr. Chalaire's employment. We hold that the evidence is legally and factually sufficient to support the finding that Mr. Chalaire was acting within the scope of his apparent authority. Appellant's first point of error is overruled.

■ Appellant's second point of error attacks the legal and factual sufficiency of the evidence to support the jury's finding that Aztec entered into a contract with Tubular. Appellant argues that the only written evidence of the contract, the purchase order sent by Tubular, was never received and, of course, never signed by Aztec. Appellant also points out that it never invoiced Tubular, as was its custom, and it received no payment for the pipe. Tubular made its payment directly to LaBouve Drilling and then Mr. LaBouve sent half the profit derived from the purchase and resale of the pipe to Ken Chalaire. Mr. Chalaire instructed that Mr. LaBouve make the check payable directly to him, rather than Aztec, for "tax reasons." This evidence does not defeat the existence of a contract between Aztec, acting through its agent, and Tubular. The testimony of two former employees of Tubular who negotiated the sale, the testimony of Mr. LaBouve, the records of long distance calls from Tubular to Aztec, and the purchase order all tend to confirm the existence of a contract. Point of error two is overruled.

■ Appellant's sixth point of error constitutes an attack on the sufficiency of the evidence to support the jury findings of false representation (Special Issue No. 6) and detrimental reliance (Special Issue No. 7). This point is based upon the premises that (1) Tubular had no contact with Aztec except through Ken Chalaire who was not the agent of Aztec and (2) Tubular failed to exercise reasonable care to protect itself. The first assumption has been fully addressed. As for the second, Aztec argues that even if Mr. Chalaire were its agent, Tubular learned from its conversations with Mr. LaBouve that he was unable to determine what type of pipe it was and therefore one of Tubular's employees should have inspected the pipe as is the custom in the industry. Special Issue No. 6 asked, "Did Aztec Corp. make a false representation to Tubular Steel, Inc. that it had located pipe conforming to the specifications required by Tubular Steel, Inc.?" The accompanying instruction required that in order to find a false representation, the jury had to find a false representation of a material fact, knowingly or recklessly made with the intent that it be relied upon by another.

The record shows that when Mr. LaBouve could not determine the type of pipe by visual inspection he told Ken Chalaire he would have an inspection done by a firm named Tuboscope. Mr. Chalaire, however, rejected the inspection plan and told Mr. LaBouve to purchase the pipe immediately. Mr. Chalaire, not Mr. LaBouve, then made the arrangements to have the pipe shipped to the port of Houston. When Mr. LaBouve read Ken Chalaire the terms of the invoice, describing the pipe as having vary-

ing end finishes and "not inspected," Mr. Chalaire told Mr. LaBouve that he would let Tubular worry about the mixed ends, further stating, "It's my customer; let me handle Mike Hefferon [of Tubular]." Mr. Chalaire then told Mr. Hefferon that he had found the pipe Tubular needed, that it was excellent pipe, and that it met Tubular's requirements. The evidence leaves no doubt that Ken Chalaire knew that the pipe did not meet Tubular's requirements as to end finish and mill certificates. The jury was certainly justified in concluding that he intentionally misrepresented the pipe so as to induce Tubular to make the purchase, that the false representations were material, and that Tubular relied upon the false representations to its detriment.

Aztec further complains that no issue was presented on proximate cause. Special Issue No. 7, inquiring about detrimental reliance, included the following instruction:

> A party to a transaction relies upon a representation when he performs some act or omits to perform some act which he otherwise would not do, but for the representation.

Special Issues No. 6 and 7 as submitted wholly encompass the elements of fraud. See Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex.1977); Nagle v. Nagle, 617 S.W.2d 811, 813 (Tex.Civ.App.— Houston [14th Dist.] 1981, reversed on other grounds, 633 S.W.2d 796 (Tex.1982). The trial court acted within its discretion in submitting the issues broadly. TEX.R.CIV. P. 277. Appellant's sixth point of error is overruled.

■ In point of error three, appellant argues that there is no written contract signed by Aztec as required by the Statute of Frauds, now codified at Section 2.201 of the Texas Business and Commerce Code (Texas UCC). The Statute of Frauds has been satisfied if, between merchants, a merchant receives a confirmation of the contract sufficient against the sender and the receiving merchant does not give written notice of objection within ten days of receipt. TEX.BUS. & COM.CODE ANN. § 2.201(b) (Tex.UCC) (Vernon 1968). Aztec gave no written notice of objection to the purchase order mailed by Tubular.

Furthermore, the Statute of Frauds was not pleaded by the defendant. Aztec contends that the following statement in its first amended original answer is sufficient to raise the Statute of Frauds as a defense:

> This Defendant has never had any transaction whatsoever with the Plaintiff in this lawsuit and there is no contractual or other type of relationship contrary to the allegations set forth in Plaintiff's petition.

Rule 94 of the Texas Rules of Civil Procedure requires that the Statute of Frauds be affirmatively set forth. The statement quoted above is insufficient to satisfy the rule. As an alternative, appellant argues that it attempted to amend its pleadings and the trial court abused its discretion in failing to allow the amendment. We find no record that such motion was made and ruled upon. Error was not preserved. Appellant's third point of error is overruled.

Point of error number four complains that the trial court erred in rendering judgment for Tubular because there was a termination of agency as a matter of law when Ken Chalaire agreed to go to the open market and buy the pipe from a third person as Mr. Chalaire was then operating outside the scope of his employment. We disagree. Aztec was in the business of buying and selling pipe. Mr. Porche, the president of Aztec, admitted that Mr. Chalaire's duties included locating pipe. Even after Mr. Chalaire stated that the pipe was not in Aztec's inventory, Tubular continued to deal with Mr. Chalaire as Aztec's employee. Tubular did not attempt to negotiate a contract with Mr. LaBouve, but rather acted upon the instructions of Aztec in sending the amount to be paid under the Aztec–Tubular agreement to LaBouve Drilling. No evidence was presented to show that Ken Chalaire ever dealt with Tubular in his individual capacity. Because the finding of agency was restricted by Special Issue No. 1 to "the occasion in question," the jury's response did require a finding that the agency had not terminated. We overrule the fourth point of error.

Aztec's fifth point of error complains that statements attributed to Ken Chalaire were inadmissible hearsay and not the admissions of a party because he was not acting within the scope of his authority. This is but a shade of prior points one and four. Our discussions of these points establish that the actions and omissions of Aztec cloaked Mr. Chalaire with the apparent authority of a salesman acting within the scope of his employment while he was employed by Aztec. An out of court statement is not hearsay if it is offered against a party by his agent concerning a matter within the scope of the agency and made during the existence of the employment relationship. TEX.R.CIV.EVID. 801(e)(2)(D). Point five is overruled.

Appellant's seventh point of error, complaining of the legal and factual sufficiency of the evidence to support the award of $35,000 actual damages, will be addressed together with appellee's cross point, asserting that the jury's finding of $35,000 has no support in the evidence and that applicable law sets Tubular's damages at $70,725. Aztec's contentions are based upon the duty of an injured party to mitigate damages. Tubular, Aztec argues, could have and should have had the pipe ends rethreaded in a machine shop for approximately $5,000. Aztec's argument ignores the fact that the pipe would still have lacked the mill certificates essential to the contract; it ignores the fact that there were tight time constraints of which Aztec was aware; and it ignores the fact that unrefuted evidence showed that Tubular had tried to mitigate damages by selling the pipe but was unsuccessful. It further ignores applicable law regarding buyers' remedies upon rightful rejection of nonconforming goods.

Applicable sections of the Texas Business and Commerce Code (Texas UCC) provide that where there is support in the evidence, aggrieved buyers are entitled to the following remedies:

§ 2.711 **Buyer's Remedies in General; Buyer's Security Interest in Rejected Goods**

(a) Where ... the buyer rightfully rejects ... with respect to any goods involved, ... the buyer may cancel and ... in addition to recovering so much of the price as has been paid

(1) "cover" and have damages under the next section [Section 2.712] as to all the goods affected whether or not they have been identified to the contract.

. . . . .

(c) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hod such goods and resell them in like manner as an aggrieved seller (Section 2.706).

§ 2.712 **"Cover"; Buyer's Procurement of Substitute Goods**

(a) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(b) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with an incidental or consequential damages as hereinafter defined (Section 2.715) but less expenses saved in consequence of the seller's breach.

§ 2.715 **Buyer's Incidental and Consequential Damages**

(a) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, ... and any other reasonable expenses incident to the delay or other breach.

TEX.BUS. & COM.CODE ANN. §§ 2.711, 2.712, 2.715 (Tex.UCC) (Vernon 1968).

Under section 2.711(a), upon a finding of liability, an aggrieved buyer is entitled to recover as much of the contract price as he has paid. Section 2.711 *et seq.* establish the exclusive means for modifying the amount of recovery sought under

the Texas UCC. Damages may exceed the price paid upon findings by the jury of cost of cover exceeding contract price (§§ 2.711 and 2.712) and by findings of incidental or consequential damages (§§ 2.712 and 2.715). Conversely, damages must be reduced by the amount of profit derived from the buyer's resale of the goods. Section 2.711(c) gives the aggrieved buyer a security interest in the goods and a right to possession pending their sale or seller's repayment of contract price paid. Any sale must be made in good faith and conducted in a commercially reasonable manner. TEX. BUS. & COM.CODE ANN. §§ 2.706 and 2.711 (Tex.UCC) (Vernon 1968). In addition to challenging buyer's evidence on the amount he was paid, a defendant seller could attack the buyer's good faith, the commercial reasonableness of the sale, or the amount derived from sale. An aggrieved buyer may retain the goods for collateral and offer them for sale. In the event that the buyer (now a section 2.711 secured party) is unsuccessful in finding a purchaser for the collateral, the Texas UCC does not permit that he be charged with the value of the collateral as a set off to his recovery. Therefore, in determining damages a jury may not consider the fact that the buyer retained possession of the goods. Nonconforming goods are by definition goods other than those ordered; those that do not sell are more likely a liability to the secured party than an asset. Furthermore, there is no Texas UCC provision requiring that a buyer of nonconforming goods rework or refabricate the goods to make them conform to the original contract between the parties.

At trial Tubular presented evidence to show its damages under the applicable Texas UCC provisions as follows:

| | |
|---|---|
| Recovery of price paid under contract § 2.711 | $64,739.00 |
| Cost of cover minus contract price ($67,325.40 − 64,739.00) § 2.712 | 2,586.40 |
| Incidental expenses §§ 2.712 and 2.715 | 3,400.00 |
| TOTAL | $70,725.40 |

These amounts were uncontroverted.

■ Evidence documenting the cost of cover came in during the testimony of a disinterested witness, a former employee, now a competitor of Tubular. An interested witness, Tubular's president, James Morgan, testified as to the incidental expenses of transportation and storage. Although the evidence was uncontroverted, the jury could have disbelieved the documentary evidence and testimony on cost of cover and incidental expenses. By awarding Tubular less than the uncontroverted amount paid under the contract, the jury determined the amount of each to be nothing. The trier of fact is the sole judge of the credibility of the witnesses. *Rego Co. v. Brannon,* 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r. e.). A jury may or may not believe a witness's testimony in whole or in part. We cannot substitute our judgment for that of the jury and order additur with respect to these two elements of recovery. *Pacific Coast Engineering Co. v. Trinity,* 467 S.W.2d 635, 639 (Tex.Civ.App.—Houston [1st Dist.] 1971), *aff'd in part and rev'd in part* 481 S.W.2d 406. Although the evidence would have supported the award of damages for cost of cover and incidental expenses, the award of unliquidated damages could be corrected only by granting a new trial. Such has not been prayed for by Tubular.

■ A different situation exists with respect to the amount paid under the contract. That amount was conclusively established. As with the evidence presented on cost of cover, proof of payment in full of the contract price was well documented by Tubular's exhibits and was admitted through the testimony of a disinterested witness. The jury findings that a contract existed, that Aztec failed to deliver goods conforming to that contract, and that such failure was a proximate cause of damages establish as a matter of law that Tubular was entitled to recovery as an aggrieved buyer under the applicable provisions of the Texas UCC. As described above, the starting point for determining the amount of this recovery was the uncontroverted amount paid by Tubular under the contract. If the jury had believed that, al-

though a contract existed, *no* payment was made under the contract, the jury finding would have been a minimum of zero and a maximum of $5,986.40 (the sum of the other two elements of damage: cost of cover and incidental expenses). The finding of $35,000 by the jury can only indicate that it believed that some amount was paid on the contract, but the dollar amount found has no support in the evidence. A jury shall not substitute a finding of its own creation for a fact conclusively established under the evidence. *See* TEX.R.CIV.P. 226a; *Callejo v. Brazos Elec. Power Coop.*, 755 S.W.2d 73 (Tex.1988).

The sole evidence presented as to the amount paid under the contract was $64,739. Aztec's defense to the suit was twofold: it denied liability and testified that Tubular could have remade and used the nonconforming goods. It did not contest the amount paid. The only evidence which a jury might properly consider to reduce the recovery of the full amount paid on the contract would be evidence that a sale of the goods resulted in a set off or evidence that the unsuccessful sale was not conducted in good faith and in a commercially reasonable manner so as to realize the full and proven value of the nonconforming goods. No such evidence was presented. Testimony that Tubular could have had the pipe ends rethreaded was not competent evidence to reduce the buyer's recovery under section 2.711.

We hold that Tubular's damages in the amount of $64,739 were established as a matter of law. Judgment n.o.v. is authorized under Rule 301 of the Texas Rules of Civil Procedure when a directed verdict would have been proper. After the jury determined liability, a directed verdict would have been proper as to the amount paid under the contract to be recovered, leaving to the jury only the issues of cost of cover and incidental damages. Aztec's seventh point of error is overruled. Tubular's cross point is sustained with respect to recovery of the full amount paid on the contract; it is denied with respect to cost of cover and incidental expenses.

The judgment of the trial court is affirmed as modified.